# COVER SHEET

## Civil Case Filing Form

*(To be completed by Attorney/Party Prior to Filing of Pleading)*

Mississippi Supreme Court Form AOC/01
Administrative Office of Courts (Rev 2020)

Civil Identification Docket ID #: County # **30** | Judicial District: ___ | Court ID (CH, CI, CO): **CO**

Case Year: **2026** | Docket Number: **22150** | Local Docket ID: ___

Month **10** Date **06** Year **26**

This area to be completed by clerk

Case Number if filed prior to 1/1/94 ______

In the **County** Court of **Jackson** County — **19th** Judicial District

**Origin of Suit (Place an "X" in one box only)**

- [X] Initial Filing
- [ ] Remanded
- [ ] Reinstated
- [ ] Reopened
- [ ] Foreign Judgment Enrolled
- [ ] Joining Suit/Action
- [ ] Transfer from Other court
- [ ] Appeal
- [ ] Other

**Plaintiff - Party(ies) Initially Bringing Suit Should Be Entered First - Enter Additional Plaintiffs on Separate Form**

Individual: Last Name **Hudson** | First Name **Benjamin** | Maiden Name, if applicable ___ | M.I. **W.** | Jr/Sr/III/IV **Jr.**

____ Check ( x ) if Individual Plainitiff is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
Estate of ______

____ Check ( x ) if Individual Planitiff is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity
D/B/A or Agency ______

Business ______
Enter legal name of business, corporation, partnership, agency - If Corporation, indicate the state where incorporated

____ Check ( x ) if Business Planitiff is filing suit in the name of an entity other than the above, and enter below:
D/B/A ______

Address of Plaintiff ______

Attorney (Name & Address) **J. Tyler Cox, 1113 Jackson ave. Pascagoula, MS** MS Bar No. **105807**

____ Check ( x ) if Individual Filing Initial Pleading is NOT an attorney

Signature of Individual Filing: **Tyler Cox**

**Defendant - Name of Defendant - Enter Additional Defendants on Separate Form**

Individual: Last Name **Butler** | First Name **Sandra** | Maiden Name, if applicable ___ | M.I. **L.** | Jr/Sr/III/IV ___

____ Check ( x ) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
Estate of ______

____ Check ( x ) if Individual Defendant is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity:
D/B/A or Agency ______

Business ______
Enter legal name of business, corporation, partnership, agency - If Corporation, indicate the state where incorporated

____ Check ( x ) if Business Defendant is acting in the name of an entity other than the above, and enter below:
D/B/A ______

Attorney (Name & Address) - If Known ______ MS Bar No. ______

____ **Check ( x ) if child support is contemplated as an issue in this suit.***
*If checked, please submit completed Child Support Information Sheet with this Cover Sheet

**Nature of Suit (Place an "X" in one box only)**

**Domestic Relations**
- [ ] Child Custody/Visitation
- [ ] Child Support
- [ ] Contempt
- [ ] Divorce:Fault
- [ ] Divorce: Irreconcilable Diff.
- [ ] Domestic Abuse
- [ ] Emancipation
- [ ] Modification
- [ ] Paternity
- [ ] Property Division
- [ ] Separate Maintenance
- [ ] Term. of Parental Rights-Chancery
- [ ] UIFSA (eff 7/1/97; formerly URESA)
- [ ] Other ______

**Appeals**
- [ ] Administrative Agency
- [ ] County Court
- [ ] Hardship Petition (Driver License)
- [ ] Justice Court
- [ ] MS Dept Employment Security
- [ ] Municipal Court
- [ ] Other ______

**Business/Commercial**
- [ ] Accounting (Business)
- [ ] Business Dissolution
- [ ] Debt Collection
- [ ] Employment
- [ ] Foreign Judgment
- [ ] Garnishment
- [ ] Replevin
- [ ] Other ______

**Probate**
- [ ] Accounting (Probate)
- [ ] Birth Certificate Correction
- [ ] Mental Health Commitment
- [ ] Conservatorship
- [ ] Guardianship
- [ ] Joint Conservatorship & Guardianship
- [ ] Heirship
- [ ] Intestate Estate
- [ ] Minor's Settlement
- [ ] Muniment of Title
- [ ] Name Change
- [ ] Testate Estate
- [ ] Will Contest
- [ ] Alcohol/Drug Commitment (Involuntary)
- [ ] Alcohol/Drug Commitment (Voluntary)
- [ ] Other

**Children/Minors - Non-Domestic**
- [ ] Adoption - Contested
- [ ] Adoption - Uncontested
- [ ] Consent to Abortion
- [ ] Minor Removal of Minority
- [ ] Other ______

**Civil Rights**
- [ ] Elections
- [ ] Expungement
- [ ] Habeas Corpus
- [ ] Post Conviction Relief/Prisoner
- [ ] Other ______

**Contract**
- [ ] Breach of Contract
- [ ] Installment Contract
- [ ] Insurance
- [ ] Specific Performance
- [ ] Other ______

**Statutes/Rules**
- [ ] Bond Validation
- [ ] Civil Forfeiture
- [ ] Declaratory Judgment
- [X] Injunction or Restraining Order
- [ ] Other ______

**Real Property**
- [ ] Adverse Possession
- [ ] Ejectment
- [ ] Eminent Domain
- [ ] Eviction
- [ ] Judicial Foreclosure
- [ ] Lien Assertion
- [ ] Partition
- [ ] Tax Sale: Confirm/Cancel
- [ ] Title Boundary or Easement
- [ ] Other ______

**Torts**
- [ ] Bad Faith
- [ ] Fraud
- [ ] Intentional Tort
- [ ] Loss of Consortium
- [ ] Malpractice - Legal
- [ ] Malpractice - Medical
- [ ] Mass Tort
- [ ] Negligence - General
- [ ] Negligence - Motor Vehicle
- [ ] Premises Liability
- [ ] Product Liability
- [ ] Subrogation
- [ ] Wrongful Death
- [ ] Other ______

IN THE County COURT OF Jackson COUNTY, MISSISSIPPI
19th JUDICIAL DISTRICT, CITY OF Pascagoula

Docket No. ____ - ____ ____
File Yr Chronological No. Clerk's Local ID

Docket No. If Filed
Prior to 1/1/94 ____

**PLAINTIFFS IN REFERENCED CAUSE - Page__ of __ Plaintiffs Pages**
**IN ADDITION TO PLAINTIFF SHOWN ON CIVIL CASE FILING FORM COVER SHEET**

**Plaintiff #** 2 **:**

**Individual:** Pitalo (Last Name) El: (First Name) ( ____ Maiden Name, if Applicable) J. (Middle Init.) ____ (Jr/Sr/III/IV)

___Check (✓) if Individual Plaintiff is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:

Estate of ____

___Check (✓) if Individual Plaintiff is acting in capacity as Business Owner/Operator (D/B/A) or State Agency, and enter that name below:

D/B/A ____

**Business** ____
Enter legal name of business, corporation, partnership, agency - If Corporation, indicate state where incorporated

___Check (✓) if Business Plaintiff is filing suit in the name of an entity other than the name above, and enter below:

D/B/A ____

ATTORNEY FOR THIS PLAINTIFF: 105807 Bar # or Name: J. Tyler Cox *Pro Hac Vice* (✓)___ Not an Attorney(✓)___

**Plaintiff #** 3 **:**

**Individual:** Seymour (Last Name) Morgan (First Name) ( ____ Maiden Name, if Applicable) ____ (Middle Init.) ____ (Jr/Sr/III/IV)

___Check (✓) if Individual Plaintiff is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:

Estate of ____

___Check (✓) if Individual Plaintiff is acting in capacity as Business Owner/Operator (D/B/A) or State Agency, and enter that name below:

D/B/A ____

**Business** ____
Enter legal name of business, corporation, partnership, agency - If Corporation, indicate state where incorporated

___Check (✓) if Business Plaintiff is filing suit in the name of an entity other than the name above, and enter below:

D/B/A ____

ATTORNEY FOR THIS PLAINTIFF: 105807 Bar # or Name: J. Tyler Cox *Pro Hac Vice* (✓)___ Not an Attorney(✓)___

**Plaintiff #** ___ **:**

**Individual:** ____ (Last Name) ____ (First Name) ( ____ Maiden Name, if Applicable) ____ (Middle Init.) ____ (Jr/Sr/III/IV)

___Check (✓) if Individual Plaintiff is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:

Estate of ____

___Check (✓) if Individual Plaintiff is acting in capacity as Business Owner/Operator (D/B/A) or State Agency, and enter that name below:

D/B/A ____

**Business** ____
Enter legal name of business, corporation, partnership, agency - If Corporation, indicate state where incorporated

___Check (✓) if Business Plaintiff is filing suit in the name of an entity other than the name above, and enter below:

D/B/A ____

ATTORNEY FOR THIS PLAINTIFF: ____ Bar # or Name: ____ *Pro Hac Vice* (✓)___ Not an Attorney(✓)___

**COUNTY - CIVIL** HANDED ☐ MAILED ☐

**No. 78017**

Date 10/7 R. 26

Received Of Taylor & Cox

Cause No. 26-22,150

| For: | | |
|---|---|---|
| | Clerk's Fees | $85.00 |
| | JSO Fund | $40.00 |
| | Steno Tax | $10.00 |
| | Jury Tax | $3.00 |
| | Law Library | $2.50 |
| | SCEF | $2.00 |
| | Court Adm. Fund | $2.00 |
| | CECSF | $10.00 |
| | CLAF | $5.00 |
| | SCCF | $0.50 |
| | RM FEE | $1.00 |
| | Copy of Summons Return | |
| | Other Advance Cost | 161 |
| | TOTAL | $ 161 |

Total Amount Paid $ 161.00 Check No. 1721

For Complaint

**RANDY CARNEY**
CIRCUIT CLERK OF JACKSON COUNTY

By Dana Ogan
DEPUTY CIRCUIT CLERK

**IN THE COUNTY COURT OF JACKSON COUNTY, MISSISSIPPI**

**BENJAMIN WARREN HUDSON, JR.**, a minor,
by and through his parent and next friend,
DR. BENJAMIN HUDSON

**ELI JAX PITALO**, a minor,
by and through his parent and next friend,
GEORGE "TRAE" PITALO, III

and
**MORGAN SEYMOUR**, a minor,
by and through his parent and next friend,
MICHAEL SEYMOUR

FILED
OCT 06 2026
RANDY CARNEY, CLERK
BY____________________ D.C.

**PLAINTIFFS**

VERSUS CAUSE NO.: CO-2026 22,150

**SANDRA L. BUTLER a/k/a "ROYALTY"** **DEFENDANT**

---

**COMPLAINT FOR DAMAGES,
PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION
(JURY TRIAL DEMANDED)**

---

COME NOW the Plaintiffs, Benjamin Warren Hudson, Jr., a minor, by and through his parent and next friend, Dr. Benjamin Hudson; Eli Jax Pitalo, a minor, by and through his parent and next friend, George "Trae" Pitalo, III; and Morgan Seymour, a minor, by and through his parent and next friend, Michael Seymour, by and through their counsel, J. Tyler Cox of *Taylor and Cox Law Firm*, and file this their Complaint against the Defendant, Sandra L. Butler, and would show the following, to-wit:

## INTRODUCTION

1. Plaintiffs Benjamin Warren Hudson, Jr. (hereinafter "Warren"), Eli Jax Pitalo (hereinafter "Jax"), and Morgan Seymour (hereinafter "Morgan") bring this action to redress the injury and damage resulting from the false and defamatory statements, accusations, and insinuations of and concerning them that Defendant Sandra L. Butler (hereinafter "Butler") has published, and continues to publish, on TikTok through the account "gods_bestgirl," where she calls herself "Royalty," and to stop Butler from continuing to brand them as killers before her audience.

2. The gist of Butler's publications is that Nolan Xavier Wells ("Nolan") was killed aboard a boat on July 4, 2026; that Warren, Jax, and Morgan are responsible for his death; and that they fled, tampered with his phone, and lied to cover it up. Butler told her audience, "They are guilty. They did something." She later told her audience that one of the group "picked him up and slammed him on the boat . . . and now he is dead." The gist of Butler's publications is false and defamatory and is actionable per se, as are the specific statements described below.

3. Warren, Jax, and Morgan did not kill Nolan, did not harm him, and had nothing to do with causing his death. Nolan was their close friend.

4. After a death investigation in which 132 subpoenas were issued and 43 witnesses testified, the Jackson County Grand Jury unanimously returned a No True Bill and found that the allegations against the occupants of the boats on which Plaintiffs traveled "are not based in truth, and are solely the result of public clamor and private malice." The Grand Jury's report was publicly released on September 21, 2026.

5. Butler read the report, described it to her audience, but did not stop. After the report was released, she published a series of videos stating that Nolan was fatally injured on the boat, that the account given by Plaintiffs was "a story to cover their tracks," and that someone got into Nolan's phone after his death and deleted its contents.

6. Butler's statements, accusations, and insinuations are not based on truthful facts or credible evidence and are not privileged. They were published negligently and with knowledge of, or reckless disregard for, their falsity.

7. Butler has announced that she will not stop. When a viewer raised the prospect of legal action against those making statements about Plaintiffs, Butler answered, "That crap don't scare me and I'm gonna keep talking about them thugs. Period."

8. Plaintiffs ask this Court to stop Butler's campaign against them now, before it does further damage. They seek damages within this Court's jurisdictional limit; a preliminary injunction barring Butler from posting, commenting, and hosting or joining LIVE broadcasts until a trial on the merits; and, in the alternative and in any event, injunctive relief directed to the disclosure of their nonpublic locating

information, the public identification of the minor Plaintiffs, direct contact with them, the solicitation of others to confront them, the preservation of evidence, and the specific statements finally adjudicated to be false and defamatory.

**PARTIES**

9. Warren is over the age of eighteen (18) but under the age of twenty-one (21) and is therefore a minor under Mississippi law. He resides in Jackson County, Mississippi. He brings this action by and through his father and next friend, Dr. Benjamin Hudson, an adult resident citizen of Jackson County, Mississippi.

10. Jax is over the age of eighteen (18) but under the age of twenty-one (21) and is therefore a minor under Mississippi law. He resides in Jackson County, Mississippi. He brings this action by and through his father and next friend, George "Trae" Pitalo, III, an adult resident citizen of Jackson County, Mississippi.

11. Morgan is over the age of eighteen (18) but under the age of twenty-one (21) and is therefore a minor under Mississippi law. He resides in Jackson County, Mississippi. He brings this action by and through his father and next friend, Michael Seymour, an adult resident citizen of Jackson County, Mississippi.

12. The foregoing allegations concerning Plaintiffs' minority and next-friend representation are made pursuant to Miss. Code Ann. § 1-3-27 and Mississippi Rule of Civil Procedure 17(c).

13. Each Plaintiff is a private citizen and has never attained the status of a public official, public figure, or vortex public figure for purposes of filing and prosecuting a defamation action. None sought public attention or voluntarily injected himself into any public controversy. After public accusations concerning Nolan's death were leveled against them, Plaintiffs gave interviews denying involvement. Those responses were made solely to defend against accusations made by others.

14. Butler, also known as Sandra Gil, Sandra Gill, and Cassandra L. Gil, is an adult resident citizen of the State of Georgia whose last known address is 102 Magnolia Plantation Court, Hinesville, Georgia 31313. Upon information and belief, Butler operates the publicly available TikTok account

"gods_bestgirl," on which she appears on camera and identifies herself as "Royalty." The conduct of this Defendant, which is the subject of this litigation occurred, in whole or in part, within the State of Mississippi. Butler may be served with process in any manner authorized by Mississippi Rule of Civil Procedure 4.

**JURISDICTION AND VENUE**

15. This Court has proper in personam and subject matter jurisdiction. Pursuant to Miss. Code Ann. § 9-9-21, Plaintiffs limit the amount or value in controversy, including the aggregate compensatory and punitive damages sought and the value of any equitable relief, to an amount not exceeding $200,000.00, exclusive of costs and interest.

16. Butler is subject to the jurisdiction of this Court pursuant to Mississippi's long-arm statute, Miss. Code Ann. § 13-3-57, because she committed a tort, in whole or in part, in the State of Mississippi against residents of this State.

17. Butler focused her publications on Plaintiffs and expressly aimed her false and defamatory accusations and insinuations at them, knowing they are residents of Jackson County, Mississippi. Her publications concern a death that occurred in Jackson County and an investigation conducted by the Jackson County Grand Jury. She addressed her videos to Plaintiffs by name and to the community of Ocean Springs, Mississippi, and she displayed the telephone number of the Jackson County Sheriff's Office and urged her viewers to call it.

18. Butler's publications were and continue to be published and accessible to viewers in Jackson County, Mississippi. It was the natural and foreseeable result of those publications that Butler's false and defamatory accusations and insinuations would be published and republished in Jackson County, Mississippi, causing harm, injury, and damage to Plaintiffs in Jackson County, Mississippi, where they reside.

19. Butler knew, or should have known, and intended that the brunt of the harm her publications caused and continue to cause Plaintiffs would be felt in Jackson County, Mississippi. Butler reasonably anticipated being haled into court in Mississippi to answer for her statements, and sufficient

minimum contacts exist with respect to this action and the State of Mississippi to satisfy the requirements of due process.

20. Venue is proper in this Court pursuant to Miss. Code Ann. § 11-11-3 because substantial acts or omissions or substantial events causing Plaintiffs' injuries and damages occurred in Jackson County, Mississippi. In the alternative, Butler is a nonresident, and each Plaintiff resides in Jackson County, Mississippi.

## FACTUAL BACKGROUND

### A. Warren, Jax, Morgan, and Nolan

21. Nolan was Plaintiffs' close friend. Warren, Jax, and Morgan loved Nolan like a brother.

22. On July 4, 2026, Plaintiffs traveled to Horn Island, a barrier island in Jackson County, Mississippi, as part of a group of approximately thirty friends aboard three boats: the Triton, the Palm Beach, and the Tideline. Nolan traveled to Horn Island aboard the Triton.

23. At approximately 4:28 p.m., the three boats departed Horn Island. Nolan, by his own choice, remained on the island to socialize with other people who were also there. Nolan was alive and well when Plaintiffs left.

24. On the return trip, the Triton was taking on water because of a bilge pump malfunction. At approximately 4:48 p.m., a member of the group called Sea Tow. The Tideline towed the Triton, and the three boats reached the mainland at approximately 6:01 p.m. Nolan was not aboard any of them.

25. That night, when no one in the group had heard from Nolan, Warren telephoned Nolan's mother at approximately 11:07 p.m. and the United States Coast Guard at approximately 11:13 p.m. to report that Nolan had not returned. Warren also spoke with the Jackson County Sheriff's Department.

26. Nolan's phone had remained with the group on the return trip. In the early morning hours of July 5, 2026, it was handed over, without delay, to persons who came asking for it. No Plaintiff touched, possessed, accessed, altered, or erased data from Nolan's phone. Nolan's keys, which he had left in Jax's bedroom, were turned over to Nolan's stepfather.

27. On the morning of July 5, 2026, Warren and Jax returned to Horn Island by boat to search for their friend.

28. No Plaintiff has any knowledge of what happened to Nolan after Plaintiffs left Horn Island, and no Plaintiff had any involvement in his disappearance or death.

**B. The Grand Jury Investigation and No True Bill**

29. The Jackson County Grand Jury investigated Nolan's death. It issued 132 subpoenas, heard from 43 witnesses, and had full and open access to the complete Jackson County Sheriff's Office investigative file, including materials from assisting agencies. The materials it considered included the Wells family's preliminary and final forensic cellphone reports and a 261-page Snapchat Conversation Report. A true and correct copy of the Grand Jury's report is attached as Exhibit A.

30. The Grand Jury unanimously returned a No True Bill with respect to the death investigation of Nolan Xavier Wells. Its report was filed on September 18, 2026. On September 21, 2026, the Jackson County District Attorney publicly announced the decision and released the report, which was widely reported.

31. The Grand Jury made the following findings concerning the public allegations against the people who rode to and from Horn Island, Ex. A at 5:

> The Grand Jury finds no credible evidence to support the public allegations that any persons who rode to or from Horn Island on July 4, 2026, on the Triton, the Palm Beach, or the Tideline engaged in any criminal conduct related to the death of Mr. Wells. The allegations against the occupants of the Triton, the Palm Beach, and the Tideline are not based in truth, and are solely the result of public clamor and private malice. Further, the public clamor and malicious allegations against the occupants of the Triton, the Palm Beach, and the Tideline have extended to their family members and friends. The Grand Jury finds that the public attacks on the occupants of the Triton, the Palm Beach, and the Tideline, as well as their family and friends, are malicious, false, and have no truth in fact or evidence.

32. Each Plaintiff rode to or from Horn Island on July 4, 2026, aboard the Triton, the Palm Beach, or the Tideline, and is therefore among the persons as to whom the Grand Jury found no credible evidence of any criminal conduct related to Nolan's death.

33. The Grand Jury also found that Nolan chose to remain on Horn Island after the three boats departed; that "Mr. Wells' phone was not the only phone to travel back to the mainland without its owner"; that Nolan "was not in any physical altercation or argument on July 4, 2026"; that "GPS data and security footage confirm the accounts of the passengers on the Triton, Palm Beach, and Tideline"; that those passengers "cooperated fully with this investigation"; and that the Sea Tow calls and interpretations circulating on the internet and social media "are not true and accurate." Ex. A at 5-6.

34. Plaintiffs do not allege that the No True Bill conclusively established the cause of Nolan's death. They allege that the Grand Jury, after examining the available evidence, found no credible evidence that Plaintiffs engaged in any criminal conduct related to Nolan's death, and that the public allegations against them are false.

### C. Butler's TikTok Account

35. Butler operates the TikTok account "gods_bestgirl," through which she publishes recorded videos to a public audience. Butler appears on camera in those videos, speaks in her own voice, and overlays them with captions of her own, most often "JUSTICE FOR NOLAN WELLS." Butler does not publish as herself. She publishes through a constructed on-camera persona, "Royalty," and the standing "JUSTICE FOR NOLAN WELLS" caption operates as a series brand affixed across her content. Upon information and belief, Butler's account is monetized, and the views, comments, shares, and follower growth her videos about Nolan's death generate confer upon Butler financial benefit, promotional benefit, or both.

36. Butler has made Nolan's death a central subject of that account. Beginning within days of July 4, 2026, and continuing after the Grand Jury's report, Butler published dozens of videos about Nolan's death and about Plaintiffs. Screen captures and transcripts of the videos described below are attached collectively as Exhibit B. Butler publishes that subject as serialized content. She packages individual videos as installments carrying tabloid captions: "WHERE IS NOLAN WELLS," "THE 911 CALL WAS A FALSE ALIBI," "THEY LIED FROM THE JUMP," "BREAKING NEWS!!!," "THE STREETS WILL TALK 'WITNESSES,'" "NOLAN WELLS — THE FIGHT, THE FALL & THE SEA TOW CALL!,"

"THE 2 CIRCLE BRUISES," "SO THERE WAS A FIGHT ON THE BOAT," and "THE KATIE STORY WAS FAKE," each of which promises her audience a fresh revelation about Plaintiffs. Still others are published as direct replies to viewer comments, a format that converts her audience's questions into the next accusation and the next video. Upon information and belief, Butler selected, escalated, and sustained these accusations because accusing three named teenagers of killing their friend and covering it up holds an audience in a way the Grand Jury's findings do not.

37. In the weeks following Nolan's death, online commentators circulated photographs and videos from the July 4 boating trip. In that online discourse, Plaintiffs were publicly identified by name and by photograph. Butler refers to Plaintiffs in her videos as "those boys," "his white friends," and, repeatedly, "those thugs." She has addressed Warren, Jax, and Morgan by name, has displayed video footage of Plaintiffs' televised interviews, and has displayed what she represents to be Plaintiffs' private group messages. Butler's audience understood her statements to be of and concerning Plaintiffs.

**D. Butler's Publications Before the Grand Jury's Report**

**1. Butler Falsely States that Plaintiffs Are Guilty**

38. Before September 21, 2026, in a video replying to a viewer's comment, Butler said (Ex. B-1):

> Butler: Okay, the truth is gonna come out. They are guilty. They did something. I don't know what it is that they did but they did something to [Nolan], absolutely . . . and no matter what you say your whiteness can't cover this one up . . . .

39. In another video replying to a viewer's comment, Butler said (Ex. B-2):

> Butler: . . . we know that those thugs are guilty of something. We know it doesn't matter, but we know that they are responsible for what happened to Nolan.

40. The gist of these statements is that Plaintiffs are guilty of a crime against Nolan and are responsible for his death. Butler made these statements as assertions of fact. The gist of these statements and the statements themselves are false and defamatory and portray Plaintiffs in a false light.

**2. Butler Falsely States that Plaintiffs Lied and Concealed Evidence**

41. In a video captioned "WHERE IS NOLAN WELLS," Butler said that Nolan's friends "have all lawyered up," and that "those same boys that he went out on the water with are now editing the pictures removing Nolan out of the pictures as Nolan was never even on the boat with them." Ex. B-3.

42. In a video captioned "THE 911 CALL WAS A FALSE ALIBI," Butler said that GPS data "confirms that there is no way that that boat was taking on any water or had mechanical issues," and that because a dispatcher was told everyone was on the boat, "everyone was on the boat." Ex. B-4.

43. In a video replying to a viewer's comment that Nolan's friends had called the Coast Guard, Butler said that the Coast Guard was "trying to say that those thugs were the ones that called for help for Nolan," that Nolan's phone was "at them thugs' house," and that "they lying." Ex. B-5. In a video captioned "THEY LIED FROM THE JUMP," Butler said that "the thugs" gave Nolan's mother a false description of his clothing and asked, "Why would y'all lie from the jump?" Ex. B-6.

44. The gist of these statements is that Plaintiffs altered photographs to remove Nolan from them, invented the Triton's mechanical failure as an alibi, did not report Nolan missing, and lied to Nolan's mother and to the authorities to conceal what happened to him. The gist of these statements and the statements themselves are false and defamatory and portray Plaintiffs in a false light. Warren reported Nolan missing to Nolan's mother and to the United States Coast Guard on the night of July 4, 2026, and the Grand Jury found that the Triton "had a bilge pump and motor malfunction on July 4, 2026, and was actively taking on water and sinking." Ex. A at 6.

**3. Butler Falsely Insinuates that a Body Was Hidden on the Boat**

45. In a video displaying footage of Plaintiffs seated for a recorded interview, Butler said (Ex. B-7):

> Butler: Now they actually helped us in the reenactment because now we know that an actual body can be hidden there . . . . So while we're mad that they're doing these interviews [it] is actually helping us putting all the pieces together.

46. The gist of this video is that Nolan's body was hidden aboard the boat on which Plaintiffs returned to the mainland. The gist of this video is false and defamatory and portrays Plaintiffs in a false light.

**4. Butler Is Warned and Announces that She Will Continue**

47. Butler's viewers told her that her statements were false and dangerous. In reply to a viewer's comment raising legal action against persons making statements about Plaintiffs, Butler said (Ex. B-8):

> Butler: I don't fear nobody but God. I do not fear no man . . . . That crap don't scare me and I'm gonna keep talking about them thugs. Period.

**E. Butler's Publications After the Grand Jury's Report**

48. Butler knew of the Grand Jury's findings. Upon the release of the report, she published a video captioned "BREAKING NEWS!!!" telling her audience that "the Jackson County grand jury has unanimous[ly] returned a no true bill in the death investigation of Nolan Xavier Wells." Ex. B-9. In a later video captioned "Nolan Wells Grand Jury — Questions That Need Answers!" she discussed the report's contents, including that it addressed the "social media allegations . . . against the boat occupants." Ex. B-10.

49. Butler nevertheless recklessly continued. After the report was released, she published the videos described below.

**1. Butler Falsely States that Nolan Was Killed on the Boat**

50. In a video captioned "THE STREETS WILL TALK 'WITNESSES,'" Butler repeated an account, attributed to an unidentified man who claimed to have overheard two unidentified women, that Nolan was struck and thrown down on a boat and "never got back up." Butler then said, in her own voice (Ex. B-11):

> Butler: I can visualize that that is exactly what happened to him. And you guys hurried off. So now it's all coming together . . . . Because one of you guys [struck] Nolan, right? And picked him up and slammed him on the boat, which is the awkward slip that you guys claim it was, and now he is dead. He is gone.

51. In a video captioned "NOLAN WELLS — THE FIGHT, THE FALL & THE SEA TOW CALL!" in which she addressed Warren by name and displayed footage of his interview, Butler said (Ex. B-12):

> Butler: Is that why they're trying to say that Nolan was never on the boat? Because you have to think about it, somebody is going to be responsible for his death. . . . Y'all know that it would make you guys responsible for what happened to Nolan and y'all didn't render aid.

52. In other videos, Butler said that "we do know for certain without a shadow of a doubt that Nolan was on the boat," Ex. B-13; that "his passing happened during the time he got onto that boat," Ex. B-14; and, under the caption "SO THERE WAS A FIGHT ON THE BOAT," that "there was a fight on the boat because now that makes sense to the contusions in the back of the head . . . . It's coming together." Ex. B-15.

53. The gist of these statements is that Nolan was fatally injured aboard the boat in Plaintiffs' presence, that Plaintiffs left him without aid and fled, and that Plaintiffs lied when they said he remained on Horn Island. The gist of these statements and the statements themselves are false and defamatory and portray Plaintiffs in a false light. Nolan was not aboard any of the three boats when they left Horn Island, and the Grand Jury found that Nolan chose to remain on the island and "was not in any physical altercation or argument on July 4, 2026." Ex. A at 5-6.

**2. Butler Falsely States that Plaintiffs Invented a Cover Story**

54. In a video captioned "THE KATIE STORY WAS FAKE," Butler said of the account that Nolan was last seen in the water with a young woman (Ex. B-16):

> Butler: . . . we know by now that that story was not true. . . . It was just a [pawn]. It was a story to cover their tracks.

55. In a video captioned "ALWAYS A STORY FILLED W/ LIES AND TRUTH," in which she displayed footage of Jax's interview, Butler said, "y'all always seem to tell the truth in the lies that y'all give." Ex. B-17. After Plaintiffs appeared in a Fox News interview on October 3, 2026, Butler published a video calling them "freaking idiots," attributing "manipulation" to them, and stating that "their stories continue to change." Ex. B-18.

56. The gist of these statements is that Plaintiffs fabricated their account of July 4, 2026, to conceal their responsibility for Nolan's death. The gist of these statements and the statements themselves are false and defamatory and portray Plaintiffs in a false light.

**3. Butler Falsely States that Nolan's Phone Was Tampered With**

57. In a video replying to a viewer's comment, Butler said (Ex. B-19):

> Butler: Then there was someone else after his death [that] got into Nolan's phone, either by entering his password or putting his phone in his face for face recognition. . . . Stuff was deleted from his phone. Everything that Nolan did on the 4th of July to include his snap[s] and videos and pictures that he took were deleted from his phone. Nolan couldn't have deleted them himself.

58. In a video captioned "LETS HEAR FROM GARRET," Butler displayed footage of Plaintiffs' interview in which they denied deleting anything from Nolan's phone, and answered, "Y'all were just living in the moment, huh?" Ex. B-20.

59. The gist of these statements is that Plaintiffs accessed Nolan's phone after his death and deleted evidence from it. The gist of these statements and the statements themselves are false and defamatory and portray Plaintiffs in a false light. No Plaintiff touched, possessed, accessed, altered, or erased data from Nolan's phone.

**F. Butler's Knowledge and Fault**

60. Butler published the statements described in Section E after the Grand Jury's report had been filed, publicly released, and widely reported, and after she had herself described the report to her audience. The Grand Jury had before it the Wells family's forensic cellphone reports and a 261-page Snapchat Conversation Report when it found that the allegations against the boat occupants are false.

61. Butler knew or should have known, in the exercise of due diligence, that her statements, accusations, and insinuations of and concerning Plaintiffs are false. Nevertheless, Butler intentionally, maliciously, in bad faith, recklessly, and/or negligently published, and continues to publish, those statements, accusations, and insinuations to the viewing public. Butler's persistence is not the product of honest mistake. Upon information and belief, Butler has a personal and pecuniary interest in the

controversy she sustains: each new accusation against Plaintiffs renews her audience's attention, while the Grand Jury's findings threatened to end the story on which her account's growth depends. Butler resolved that conflict against the truth and against three teenagers.

**G. The Resulting Harm and the Threat of Further Harm**

62. After Butler's publications, Plaintiffs and their families received threatening and harassing messages, calls, and comments.

63. As a direct and proximate result of Butler's conduct, each Plaintiff has suffered injury to his reputation, humiliation, fear for his safety, anxiety, and restriction of his ordinary activities and routines. Each Plaintiff seeks recovery only for his own injury proximately caused by Butler's actionable conduct, not for injury caused by others in the wider controversy.

64. Butler's conduct is ongoing. She continues to publish videos about Plaintiffs and has stated that she will continue. Unless restrained by this Court, Butler is likely to continue directing her audience's hostility toward Plaintiffs.

65. The threatened injury is immediate and irreparable. No award of money damages after trial can undo physical harm or restore a young man's safety or his name.

**COUNT I: DEFAMATION PER SE**

66. Plaintiffs hereby adopt and re-allege each and every paragraph preceding Count One of this Complaint and make the same a part of this Count.

67. Butler has libeled and slandered Plaintiffs through her false and defamatory statements and her unprivileged publication of those statements to viewers in Jackson County, Mississippi, and elsewhere. The statements referenced herein, or the substance or gist of same, are of and concerning each Plaintiff and are libelous and slanderous per se because they impute to each Plaintiff criminal responsibility for Nolan's death, tampering with physical evidence, and hindering prosecution, each a felony under Mississippi law. Miss. Code Ann. §§ 97-3-19, 97-9-125, 97-9-105. Other of Butler's statements referenced herein are libelous and slanderous when viewed in their context and in the context of Butler's wrongful acts. Butler's

acts were malicious, in bad faith, and made with knowledge of or reckless disregard for their falsity or were at least negligent. Butler is liable for the foreseeable republication of her statements.

68. The publication of these false and defamatory statements has injured and damaged each Plaintiff's reputation; has diminished the esteem, respect, goodwill, and confidence in which each Plaintiff is held; has excited adverse, derogatory, and unpleasant feelings and opinions against each of them; and has caused each of them to suffer humiliation, emotional distress, and other damages.

**COUNT II: TORTIOUS INVASION OF PRIVACY THROUGH PUBLICITY PLACING A PERSON IN A FALSE LIGHT**

69. Plaintiffs hereby adopt and re-allege each and every paragraph preceding Count Two of this Complaint and make the same a part of this Count.

70. Through the unprivileged publication of the statements, images, and videos described herein, Butler gave publicity to matters concerning Plaintiffs and placed them before the public in a false light, as persons responsible for their friend's death who concealed it and escaped justice, which would be highly offensive to a reasonable person. Butler had knowledge of, or acted in reckless disregard as to, the falsity of the publicized matters and the false light in which Plaintiffs would be placed, including by publishing after the Grand Jury's findings were made public.

71. As a direct and proximate result, each Plaintiff has suffered mental anguish, emotional distress, humiliation, and fear for his safety. This Count is pleaded in addition to and in the alternative to Count One, and Plaintiffs seek no duplicate recovery.

**COUNT III: CIVIL STALKING**

72. Plaintiffs hereby adopt and re-allege each and every paragraph preceding Count Three of this Complaint and make the same a part of this Count.

73. Mississippi law prohibits any person from purposefully engaging in a course of conduct directed at a specific person, or making a credible threat, when the person knows or should know that the conduct would cause a reasonable person to fear for his safety or the safety of another. Miss. Code Ann. §

97-3-107. That statute was enacted to protect persons in Plaintiffs' position from the type of harm Plaintiffs have suffered.

74. Butler violated that statute by purposefully engaging in a course of conduct directed at Plaintiffs, consisting of dozens of videos published over a period of months branding Plaintiffs as "thugs" responsible for Nolan's death, continued after she was warned and after the Grand Jury's findings were made public, together with her announcement that she would "keep talking about them thugs," when she knew or should have known that such conduct would cause a reasonable person to fear for his safety.

75. Butler's violation of that statute establishes the standard of conduct Butler breached, supports negligence per se, and furnishes grounds for the injunctive relief requested herein. As a direct and proximate result, each Plaintiff has suffered fear for his safety, emotional distress, restriction of his activities, and other damages. This Count is pleaded in the alternative and without duplicate recovery.

**COUNT IV: PRELIMINARY INJUNCTION**

76. Plaintiffs hereby adopt and re-allege each and every paragraph preceding Count Four of this Complaint and make the same a part of this Count. This Count is asserted under Mississippi Rule of Civil Procedure 65(a).

77. As shown by the specific facts set forth in this Complaint, Plaintiffs will suffer immediate and irreparable injury, loss, or damage unless Butler is enjoined pending final judgment. Butler is engaged in an ongoing course of publications branding Plaintiffs as responsible for Nolan's death and continues to publish. Butler's account is the instrument of the harm. Every post and comment renews her accusation before her audience and inflicts injury that no later judgment can undo. Butler has stated that she will not stop on her own.

78. Upon notice and hearing, Plaintiffs request a preliminary injunction, effective immediately and continuing until final judgment after a trial on the merits, that prohibits and enjoins Butler, and those persons in active concert or participation with her who receive actual notice of the order, from: (i) creating, posting, publishing, uploading, scheduling, sharing, reposting, stitching, duetting, or otherwise disseminating any content of any kind and on any subject, whether video, audio, photograph, image, text,

or otherwise, on TikTok, Instagram, YouTube, Facebook, X, Threads, Snapchat, Twitch, Kick, Rumble, Discord, Reddit, or any other social-media, video-sharing, or livestreaming platform, whether through her own accounts, any new, alternate, anonymous, or pseudonymous account, any account belonging to another person, or any person acting at her direction or on her behalf; (ii) starting, hosting, co-hosting, joining, requesting to join, accepting an invitation to join, appearing in, speaking in, being seen or heard in, moderating, or otherwise participating in any LIVE, livestream, LIVE battle, multi-guest LIVE, co-host session, audio room, or other real-time broadcast on any such platform, whether on camera, off camera, or by voice only, and whether from her own device or another person's; and (iii) posting, publishing, or sending any comment, reply, direct message, or chat on any such platform, including in the chat or comments of another person's LIVE or post. In the alternative, Plaintiffs request a preliminary injunction that:

(a) prohibits and enjoins Butler, and those persons in active concert or participation with her who receive actual notice of the order, from publishing, posting, broadcasting, or otherwise disseminating any Plaintiff's home address, school, workplace, telephone number, vehicle description, or other nonpublic identifying or locating information, or that of any member of a Plaintiff's household;

(b) prohibits and enjoins Butler from encouraging, soliciting, or directing others to locate, contact, visit, follow, threaten, harass, or confront any Plaintiff or any member of a Plaintiff's household;

(c) prohibits and enjoins Butler from publishing, posting, broadcasting, or otherwise disseminating the name, photograph, video image, voice, or likeness of any Plaintiff, or any username, social-media handle, or other identifier of any Plaintiff, in any content within her control;

(d) prohibits and enjoins Butler from directly or indirectly contacting, messaging, tagging, or mentioning by username or handle any Plaintiff or any member of a Plaintiff's household,

and from recording, broadcasting, or livestreaming within 1,000 feet of any Plaintiff's residence or school;

(e) requires Butler to remove from any account within her control any content that discloses any Plaintiff's nonpublic identifying or locating information or that displays any Plaintiff's name, photograph, video image, or likeness; and

(f) requires Butler to preserve, and not delete, destroy, or alter, all content, recordings, messages, and data relating to Plaintiffs, Nolan Wells, or the subject matter of this action, including content removed under subparagraph (e).

79. Nothing less than the complete restraint requested in the first sentence of Paragraph 78 will stop the harm. Butler has used recorded videos, replies to viewers' comments, footage of Plaintiffs' own interviews, and what she represents to be Plaintiffs' private messages to brand Plaintiffs as responsible for Nolan's death, and an order limited to particular content would invite evasion through rephrased statements and new accounts. Should the Court decline to enter that restraint, the alternative restraint set forth in subparagraphs (a) through (f) of Paragraph 78 is narrowly tailored and should issue at a minimum. The alternative restraint does not restrict Butler's commentary on the investigation of Nolan's death or any other matter of public concern; it reaches only the disclosure of Plaintiffs' nonpublic locating information, the public identification of the minor Plaintiffs by name, image, or likeness, direct contact with Plaintiffs and their households and proximity to their homes and schools, the solicitation of others to locate, contact, or confront Plaintiffs, the removal of content so disclosing or identifying them, and evidence preservation. Plaintiffs request that security under Rule 65(c) be set in a nominal amount.

80. Plaintiffs are entitled to a preliminary injunction because there is a substantial likelihood that they will prevail on the merits; the injunction is necessary to prevent irreparable injury; the threatened injury to Plaintiffs outweighs any harm the injunction might do to Butler; and entry of the injunction is consistent with the public interest.

## COUNT V: PERMANENT INJUNCTION

81. Plaintiffs hereby adopt and re-allege each and every paragraph preceding Count Five of this Complaint and make the same a part of this Count.

82. Upon final adjudication, Plaintiffs request a permanent injunction (a) continuing the relief described in Paragraph 78; (b) requiring Butler to remove from any account within her control the specific statements finally adjudicated false and defamatory; and (c) prohibiting Butler from republishing the specific statements so adjudicated. Damages alone are an inadequate remedy because, absent such relief, Butler's adjudicated falsehoods will remain online and continue to injure Plaintiffs indefinitely.

83. Any injunctive relief will describe the restrained conduct in reasonable detail and will bind nonparties only as permitted by Mississippi Rule of Civil Procedure 65(d).

## DAMAGES

84. As a direct and proximate result of the acts and omissions of Butler described herein and to be proven at trial, each Plaintiff has sustained serious damage to his reputation as well as mental and emotional distress, and each will continue to experience such damage in the future. Accordingly, each Plaintiff is entitled to an award of actual or compensatory damages, including presumed damages as permitted by law, in an amount that will fully and fairly compensate him for the damages and injuries suffered, past, present, and future. Because Butler's statements falsely impute to each Plaintiff criminal responsibility for Nolan's death, tampering with physical evidence, and hindering prosecution, they are defamatory per se, and injury to each Plaintiff's reputation is presumed as a matter of law without proof of special damages. Butler made those statements with knowledge of their falsity or with reckless disregard for whether they were false, and each Plaintiff is therefore entitled to presumed damages in addition to any actual damages proven at trial.

85. Additionally, Butler's willful and grossly negligent conduct complained of herein and to be proven at trial entitles Plaintiffs to an award of punitive damages pursuant to Miss. Code Ann. § 11-1-65. Butler acted with actual malice and with gross negligence evidencing a willful, wanton, and reckless disregard for the safety of others, including by continuing to publish false criminal accusations after the

Grand Jury's findings were made public and after announcing that she would not stop. Butler's malice is further evidenced by her motive. Upon information and belief, Butler derives financial and reputational benefit from the attention her accusations generate and has continued to publish them because doing so profits her, notwithstanding her knowledge that the Grand Jury found the allegations against the boat occupants "are not based in truth, and are solely the result of public clamor and private malice."

86. All monetary and equitable relief sought is subject to the jurisdictional limitation stated in Paragraph 15. The compensatory and punitive damages requested are aggregate amounts for this action, not separate demands for each Plaintiff.

**WHEREFORE, PREMISES CONSIDERED**, the Plaintiffs, Benjamin Warren Hudson, Jr., Eli Jax Pitalo, and Morgan Seymour, each by and through his father and next friend, demand a trial by jury and judgment against the Defendant, Sandra L. Butler, and pray that process issue to the Defendant as required by law and that the Court grant the following relief:

(a) A Preliminary Injunction as described in Paragraph 78, upon nominal security, and a Permanent Injunction as described in Count Five;

(b) Actual, compensatory, and presumed damages, and punitive damages under Miss. Code Ann. § 11-1-65, in amounts to be determined by the jury, provided that all damages and the value of all equitable relief shall not exceed $200,000.00 in the aggregate, exclusive of costs and interest; and

(c) Costs of court, prejudgment and post-judgment interest as allowed by law, and such other relief as the Court finds just.

**RESPECTFULLY SUBMITTED**, this the 6 day of October 2026.

FOR: BENJAMIN WARREN HUDSON, JR.,
ELI JAX PITALO, and
MORGAN SEYMOUR,
each by and through his father and next friend, **PLAINTIFFS**

BY: [signature]
HON. J. TYLER COX, ATTORNEY FOR PLAINTIFFS

**PREPARED AND SUBMITTED BY:** **TAYLOR AND COX LAW FIRM**

STATE OF MISSISSIPPI
COUNTY OF JACKSON

PERSONALLY CAME AND APPEARED before me, the undersigned authority in and for the jurisdiction aforesaid, BENJAMIN WARREN HUDSON, JR., Plaintiff, and DR. BENJAMIN HUDSON, his father and next friend, who, after first being duly sworn, each state on oath that he has read the foregoing Complaint; that the matters and facts stated therein concerning himself and his own experiences are true and correct of his own personal knowledge; and that all other matters stated therein are true and correct to the best of his knowledge, information, and belief, and as to those matters he believes them to be true.

BENJAMIN WARREN HUDSON, JR.

Dr. B Hudson

DR. BENJAMIN HUDSON, Next Friend

SWORN TO AND SUBSCRIBED before me, this the 6 day of October 2026.

Christine Seaman

NOTARY PUBLIC

My Commission Expires: ____________

STATE OF MISSISSIPPI
CHRISTINE SEAMAN
NOTARY PUBLIC
Jackson County
Commission Expires
July 19, 2027
COMMISSION NUMBER 368644

STATE OF MISSISSIPPI

COUNTY OF JACKSON

PERSONALLY CAME AND APPEARED before me, the undersigned authority in and for the jurisdiction aforesaid, ELI JAX PITALO, Plaintiff, and GEORGE "TRAE" PITALO, III, his father and next friend, who, after first being duly sworn, each state on oath that he has read the foregoing Complaint; that the matters and facts stated therein concerning himself and his own experiences are true and correct of his own personal knowledge; and that all other matters stated therein are true and correct to the best of his knowledge, information, and belief, and as to those matters he believes them to be true.

Jax Pitalo
ELI JAX PITALO

George Pitalo III
GEORGE "TRAE" PITALO, III, Next Friend

SWORN TO AND SUBSCRIBED before me, this the 6 day of October 2026.

Christine Seaman
NOTARY PUBLIC

My Commission Expires: ____________________

STATE OF MISSISSIPPI
CHRISTINE SEAMAN
NOTARY PUBLIC
Jackson County
Commission Expires
July 19, 2027
COMMISSION NUMBER 368644

STATE OF MISSISSIPPI

COUNTY OF JACKSON

PERSONALLY CAME AND APPEARED before me, the undersigned authority in and for the jurisdiction aforesaid, MORGAN SEYMOUR, Plaintiff, and MICHAEL SEYMOUR, his father and next friend, who, after first being duly sworn, each state on oath that he has read the foregoing Complaint; that the matters and facts stated therein concerning himself and his own experiences are true and correct of his own personal knowledge; and that all other matters stated therein are true and correct to the best of his knowledge, information, and belief, and as to those matters he believes them to be true.

Morgan Seymour
MORGAN SEYMOUR

M. Seymour
MICHAEL SEYMOUR, Next Friend

SWORN TO AND SUBSCRIBED before me, this the 6 day of October 2026.

Christine Seaman
NOTARY PUBLIC

My Commission Expires:

STATE OF MISSISSIPPI
CHRISTINE SEAMAN
NOTARY PUBLIC
Jackson County
Commission Expires
July 19, 2027
COMMISSION NUMBER 369644

**EXHIBIT A – GRAND JURY REPORT – FILED COVER**

**FILED**
SEP 18 2026 R
RANDY CARNEY, CLERK
BY______________D.C.




Jackson County
Grand Jury Report
September 14-18, 2026

# EXHIBIT A – GRAND JURY REPORT – PRINTED PAGE 1

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSISSIPPI**
**19TH CIRCUIT COURT DISTRICT**

**IN RE: DEATH INVESTIGATION**
**OF NOLAN XAVIER WELLS**

---

**GRAND JURY REPORT**

---

The Jackson County Grand Jury was impaneled on April 20, 2026, reconvened on September 14, 2026, and adjourned on September 18, 2026. The Grand Jury finds that the death of Nolan Xavier Wells on or about July 4, 2026, in Jackson County, Mississippi, being of great public concern, is within the Grand Jury's investigative authority. The Grand Jury engaged in a thorough and complete investigation into the death of Mr. Wells. Our sworn duty is to allow or deny issuance of an indictment. As the foreperson of the Grand Jury, I report that the Grand Jury unanimously returns a No True Bill with respect to the death investigation of Nolan Xavier Wells.

Pursuant to Rule 13.6 of the Mississippi Rules of Criminal Procedure, the Grand Jury is authorized to issue a report of its findings related to the death investigation of Mr. Wells, and said report is being filed with the Circuit Clerk of Jackson County, Mississippi.

Pursuant to Rule 13.5 of the Mississippi Rules of Criminal Procedure, a Grand Juror, except when called as a witness in court, shall keep secret the proceedings and actions taken in reference to matters brought before the Grand Jury for six (6) months after final adjournment of the Grand Jury, and the name and testimony of any witnesses appearing before the Grand Jury shall be kept secret. The date of final adjournment of the Grand Jury is unknown as of the date of this report.

The Grand Jury was impaneled pursuant to Rule 13.1 of the Mississippi Rules of Criminal Procedure, consisting of twenty-five (25) Grand Jurors from a cross section of citizens of Jackson County, Mississippi. Two (2) Grand Jurors requested to be excused from this session for unavoidable and urgent reasons. The twenty-three (23) Grand Jurors that heard this matter ranged in age from twenty-seven (27) to sixty-eight (68) years of age and included thirteen (13) males, ten (10) females, twelve (12) Caucasians, five (5) African Americans, one (1) Asian, two (2) Hispanics, two (2) Native Americans, and one (1) individual who preferred "other."

# EXHIBIT A – GRAND JURY REPORT – PRINTED PAGE 2

The Grand Jury was expressly charged by the impaneling Circuit Judge with not only being the means of bringing to trial those people who are accused of a crime, but "also to protect persons from unfounded accusations whether presented by legal officers or by others who may be motivated by public clamor or private malice."

The District Attorney advised the Grand Jury as to all relationships and interactions of any kind amongst the various individuals involved in the case, including witnesses, investigators, or prosecutors. The Grand Jury finds no conflicts of interest in the investigation and presentation of this matter.

The Grand Jury issued one hundred thirty-two (132) subpoenas and heard from forty-three (43) witnesses. Seven (7) individuals were invited to testify before the Grand Jury. [redacted], [redacted], [redacted], [redacted] and [redacted] accepted the Grand Jury's invitation and testified in this matter. [redacted] was also invited and wished to testify, but was unable due to circumstances outside of [redacted] control. The Grand Jury did consider [redacted] recorded statement to law enforcement in its deliberations. [redacted] did not accept the Grand Jury's invitation to testify. The Grand Jury did consider [redacted] recorded statement to law enforcement in its deliberations.

The Grand Jury, through the District Attorney's Office, made written requests to the family of Mr. Wells and their legal team to produce any evidence collected in their independent investigation into the death of Mr. Wells. [redacted], on behalf of Mr. Wells' family, advised that their investigation revealed no witnesses or evidence "whom the legal team reasonably believes possess information germane to potential criminal activity that warrants referral to your office [the District Attorney's Office]." Further, the family did not request that any "additional document, recording, photograph, digital media, report, or other material in the legal team's possession be submitted to the Grand Jury." The Grand Jury received a fourteen (14) page report concerning Mr. Wells' cellular phone prepared by the families' own forensic examiner, Garrett Discovery Inc., entitled "Mobile Device Examination Findings Preliminary Report" that was provided to the District Attorney on August 28, 2026. After the Grand Jury convened to hear this matter, the Grand Jury received a twenty-one (21) page "mobile device examination findings – device lock state, screen activity, messages, calls, location, and application usage…final report"

## EXHIBIT A – GRAND JURY REPORT – PRINTED PAGE 3

and a two-hundred sixty-one (261) page "Snapchat Conversation Report." The Grand Jury considered these reports in its investigation into the death of Mr. Wells. The Grand Jury also received copies of all correspondence between the District Attorney and the legal team for Mr. Wells' family.

The Grand Jury had full and open access to the complete investigative file of the Jackson County Sheriff's Office, which included materials from all law enforcement agencies who assisted in the Death Investigation of Mr. Wells. The Grand Jury considered, *inter alia*, the following:

- Testimony of witnesses;
- Physical evidence collected during the investigation;
- Digital evidence collected during the investigation;
- Reports generated during the investigation;
- Interviews and recorded statements collected during the investigation;
- Images collected during the investigation;
- Videos/recordings collected during the investigation;
- Maps collected/generated during the investigation;
- Global Positioning System (GPS) and location data collected during the investigation;
- Cellular phone extractions collected during the investigation; and
- Responses to subpoenas duces tecum.

In addition to the reports from Mr. Wells' family's legal team from their forensic examination of Mr. Wells' cellular phone, the Grand Jury heard sworn testimony of forensic pathologist Dr. [redacted] Dr. [redacted] was retained by the Wells family to conduct an independent autopsy. The Grand Jury is aware that Dr. [redacted] was provided full and complete access to all investigative materials. Dr. [redacted] also visited Horn Island with law enforcement and District Attorney staff and met with the Chief Medical Examiner for the State of Mississippi, Dr. [redacted] at the Mississippi Forensics Laboratory. Dr. [redacted] was given full access to examine Mr. Wells' internal neck structures retained by the medical examiner and his request for the making of additional slides for histological study was fulfilled. Dr. [redacted] confirmed that the retention of this tissue is appropriate and best practice in forensic pathology. Dr. [redacted] also dispelled rumors about various other organs, including the lungs and stomach, being retained. Dr. [redacted] confirmed that he received all of Mr. Wells' body parts, except for the internal neck structures appropriately retained by the medical examiner. The Grand Jury finds that Mr. Wells did

# EXHIBIT A – GRAND JURY REPORT – PRINTED PAGE 4

not have cocaine in his system at the time of his death and found no evidence to suggest Mr. Wells ever used cocaine. The Grand Jury considered the toxicology report in this matter which supports witness accounts about Mr. Wells from July 4, 2026, but understands the toxicology is not particularly informative as decomposition fluid is an unreliable source for evaluating substance levels within a body.

Both the State of Mississippi Chief Medical Examiner and Dr. [redacted] opined that the cause and manner of Mr. Wells' death is undetermined and that drowning is a diagnosis of exclusion. There was bruising on the back of Mr. Wells' head which was not a fatal injury. Further, the Grand Jury found no evidence of any fatal injury or organic disease to Mr. Wells' body. The State of Mississippi's Chief Medical Examiner and Dr. [redacted] disagree about the presence of bruising (non-deep tissue) on Mr. Wells' buttocks and shoulder. The Grand Jury considered credible evidence concerning the circumstances of how Mr. Wells sustained the injury to the back of his head, but the exact cause of the injury remains uncertain. A witness testified under oath that he saw Mr. Wells slip awkwardly off the side of a boat around the time of 3:30 p.m. on July 4, 2026, but could not say whether Mr. Wells struck his head during the fall. The witness testified that Mr. Wells continued to socialize after the fall and did not appear injured. The Grand Jury understands that neither forensic expert has ruled out accidental drowning as a cause of Mr. Wells' death. While the Grand Jury found no other evidence to explain the bruising on the back of Mr. Wells' head, or the suspected bruising on his buttocks and shoulder, the Grand Jury cannot say with absolute certainty that this fall caused this bruising.

The Grand Jury finds that Mr. Wells accompanied a group of friends to Horn Island on July 4, 2026. This group of friends traveled on three (3) different boats: the Triton, the Palm Beach, and the Tideline. Mr. Wells traveled to Horn Island on the Triton. [redacted], and [redacted] traveled to or from Horn Island on the Triton. [redacted], [redacted] and [redacted] rode either to or from Horn Island on the Palm Beach. [redacted] and [redacted] either rode to or from Horn Island on the Tideline.

## EXHIBIT A – GRAND JURY REPORT – PRINTED PAGE 5

The Grand Jury finds that Mr. Wells chose to remain at Horn Island on the afternoon of July 4, 2026, after the Triton, the Palm Beach, and the Tideline departed the island. Other individuals, including Mr. Wells, remained at the island to socialize. The Grand Jury finds no credible evidence to support the public allegations that any persons who rode to or from Horn Island on July 4, 2026, on the Triton, the Palm Beach, or the Tideline engaged in any criminal conduct related to the death of Mr. Wells. The allegations against the occupants of the Triton, the Palm Beach, and the Tideline are not based in truth, and are solely the result of public clamor and private malice. Further, the public clamor and malicious allegations against the occupants of the Triton, the Palm Beach, and the Tideline have extended to their family members and friends. The Grand Jury finds that the public attacks on the occupants of the Triton, the Palm Beach, and the Tideline, as well as their family and friends, are malicious, false, and have no truth in fact or evidence.

The Grand Jury received the original Sea Tow call made by occupants of the Triton on July 4, 2026. The Grand Jury finds that the various Sea Tow calls and interpretations of the call circulating on the internet and social media are not true and accurate.

The Grand Jury recognizes that it is common for individuals visiting Horn Island to socialize on boats and in the water. The Grand Jury finds that it is not unusual or suspicious for individuals to return from the island on boats they did not travel to the island on; nor is it unusual for individuals to place their phones and personal items on other boats they visit and socialize on. The Grand Jury finds that Mr. Wells' phone was not the only phone to travel back to the mainland without its owner.

The Grand Jury finds that Mr. Wells attended a pool party on July 3, 2026, and a week prior. The Grand Jury finds that the pool party images widely circulating on social media and other internet platforms were not taken the night of July 4, 2026, and have no evidentiary value to the death investigation of Mr. Wells.

The Grand Jury finds that Mr. Wells purchased his alcohol with his fake identification card. The Grand Jury further finds that no individuals over the age of twenty-one (21) provided alcohol to Mr. Wells or his friends on July 4, 2026.

# EXHIBIT A – GRAND JURY REPORT – PRINTED PAGE 6

The Grand Jury finds that the Triton had a bilge pump and motor malfunction on July 4, 2026, and was actively taking on water and sinking. The Grand Jury finds that the Triton was towed for a short distance by the Tideline allowing the water to drain from the boat interior while a passenger manually held the motor trim button down.

The Grand Jury finds that there was a thorough search of Horn Island on July 5, 2026, in advance of the discovery of Mr. Wells' body. The Grand Jury is confident that had his body been on the island at that time, it would have been discovered during the extensive search.

The Grand Jury recognizes there have been public assertions that Mr. Wells was the only African American individual on Horn Island on July 4, 2026. The Grand Jury finds that Mr. Wells was not the only African American on Horn Island that day. These false assertions have led to misidentification, speculation, and rumors concerning the death of Mr. Wells.

The Grand Jury finds that GPS data and security footage confirm the accounts of the passengers on the Triton, Palm Beach, and Tideline.

The Grand Jury finds that Mr. Wells was not in any physical altercation or argument on July 4, 2026.

The Grand Jury finds that the individuals who traveled to or from Horn Island on the Triton, Palm Beach, and Tideline cooperated fully with this investigation, including offering marine GPS devices, surveillance footage, cell phones, and statements to law enforcement officers and Mr. Wells' family during this investigation.

The Grand Jury finds that the position of, the condition of, time of discovery, and location of Mr. Wells' body is consistent with drowning.

The Grand Jury finds that Mr. Wells chose to remain on Horn Island after the boat he arrived on departed, which is common for visitors to Horn Island on holidays and other crowded days.

The Grand Jury conducted a comprehensive inquiry into the death of Mr. Wells and is confident in the extensive investigation done by both Federal and State law enforcement agencies.

# EXHIBIT A – GRAND JURY REPORT – PRINTED PAGE 7

The Grand Jury acknowledges that there is no statute of limitations on homicide cases in the State of Mississippi. If credible evidence comes to light in the future that suggests Mr. Wells' death was non-accidental, this matter should be represented to the Jackson County Grand Jury for further consideration.

The Grand Jury wishes to extend our deepest and heartfelt sympathy to the parents, family members, and friends of Mr. Wells. The evidence received in this matter convinced the Grand Jury of Mr. Wells' outstanding character.

The Grand Jury wishes to thank the Court for the opportunity to serve our community in this important role and encourages citizens to serve when called upon.

---

COUNTY OF MISSISSIPPI

COUNTY OF JACKSON

PERSONALLY, appeared before me, the undersigned authority in and for the jurisdiction aforesaid, [redacted] Grand Jury Foreperson, who after being sworn by me, states on his oath and certifies that, to the best of [redacted] knowledge, the foregoing represents a true and correct report of the Grand Jury impaneled April 20, 2026, Grand Jury, being recalled on September 14, 2026.

[redacted]
Grand Jury Foreperson

Sworn and subscribed before me on this the 18th day of September, 2026.

Randy Carney, Circuit Clerk




By: [redacted]
Deputy Clerk

RANDY CARNEY
CIRCUIT CLERK
JACKSON COUNTY, MS
MY COMMISSION EXPIRES: DEC 31, 2027

7

## EXHIBIT B – SCREEN CAPTURES AND TRANSCRIPTS OF DEFENDANT'S TIKTOK VIDEOS

Each video was published on the TikTok account "gods_bestgirl."

### EXHIBIT B-1: Reply to viewer comment, captioned "JUSTICE FOR NOLAN WELLS"




[0:00] Stephanie, stop your gauh dang lie. You was a got-dang lie. Okay, your nose is as big as the lie on your face man because did you not just read the end of this post? Did you not see what the captain said? The captain said that he saw, he and three of his passengers can confirm that Nolan and those thugs...

[0:19] that you're trying to clear up, were on the land at five after five o'clock as a matter of fact. He said after five, you're lying. Okay, you're lying. Okay, stop it. Stop it. Stop it. Okay, the truth is gonna come out. They are guilty. They did something.

[0:36] I don't know what it is that they did but they did something to know it absolutely they freaking did and no matter what you say your whiteness can't cover this one up so move around to move around don't come over here with that don't come over here with that it just amazing me and it's disgusting to me that you as I'm sure you have children you don't even have a heart as a mother

[0:55] to even say Nolan's mom deserves justice. Something happened. Bring J-Vion into it. J-Vion did not say that he last spoke to Nolan at 5 o'clock. You was a goddamn lie. Ma'am, what is you talking about? What are you talking about? Because they all, they claimed that they last spoke and saw Nolan at 4 o'clock.

[1:18] Hello, the captain said that was a lie. The captain said he can confirm and so could three of his guests confirm that they saw Nolan and those thugs on land? Move around.

**EXHIBIT B-2: Reply to viewer comment, captioned "JUSTICE FOR NOLAN WELLS"**




[0:00] Of course you are lying John because actually quote and I quote Javon said Nolan is the type of person who wouldn't normally separate from his friends it wasn't like him to do that he would never leave his people and or just disappear without his friends he also said that it just doesn't add up

[0:21] quote, okay? So stop you lying, stop trying to pin it on the black boys, stop that because we know that those thugs are guilty of something. We know it doesn't matter, but we know that they are responsible for what happened to Nolan. So please stop using your whiteness as an excuse or a cover-up to make sure that these thugs, uh,

[0:44] I don't know seemingly appear innocent in your eyes because again all the evidence all of the things that nothing is adding up and the thing is I said in my last night video you are part of the problem and why people of color never receive the proper justice and or look into thoroughly because in your whiteness minds this is what you really believe

## EXHIBIT B-3: "WHERE IS NOLAN WELLS"




[0:00] Nolan Xavier Wells, a black 18-year-old male was last seen with his white friends at Horn Island in Jackson, Mississippi, in the water on the 4th of July at 3 p.m. They were on a boat. He goes out there. They go out there to celebrate the 4th of July. He was seen by many people on that boat. However, Nolan was the only one that did not return. You heard me right.

[0:22] Nolan was the only one that did not return and now his friends his white friends are now saying well they're not even talking anymore as a matter of fact they have all lord up and they're not saying anything also the original post of him or what he had on was that he had on black shorts which is now actually blue shorts and I will show you a picture also

[0:44] those same boys that he went out on the water with are now editing the pictures removing Nolan out of the pictures as Nolan was never even on the boat with them.

## EXHIBIT B-4: "THE 911 CALL WAS A FALSE ALIBI"




[0:00] Also going to debunk and throw that 911 call out the window. And I'm going to tell you why because now that we have heard the 911 dispatcher acts whoever made that call, is everyone on the boat? They said yes. They also asked, the dispatcher also asked whoever the caller was, is everyone okay on the boat? And they said yes. So everyone was on the boat. Okay, not only that, but if the GPS...

[0:23] Again, y'all thinking that that GPS helped them. It didn't help them because the GPS now confirms that there is no way that that boat was taken on any water or had mechanical issues because how does that boat continue on? How and why did it continue on? Why did it also go off an extra six-point miles out of the way?

[0:44] to go dock at Fort Bayou versus where it originated from, which was Ocean Springs, Two Horns Island. Y'all gotta make it make sense. It's not making any sense. So that part for me is out the window. Period. And y'all could say yes, I'm going to.

**EXHIBIT B-5: Reply to viewer comment regarding the Coast Guard**




[0:00] I don't know why the Coast Guard is backpedaling and trying to say that those thugs were the ones that called for help for Nolan but they is lying at their teeth because his mom when she realized how late it was getting and had not heard from Nolan or he had made it made it back yet she went on the app that they share which is at 360 and saw that there was movement on land and that his phone was back.

[0:21] obviously at them Thug's house. And so she sent her friend over there to get the phone and she asked those Thugs where was Nolan and they said, oh we thought he made it back home already. How can Nolan make it back when one they still had his phone and two his car was still at the house? Come on make it make sense they lying they lying at their teeth and I don't know why the Coast Guard is lying for them but again we're talking about it's Mississippi they stay lying for each other you they

**EXHIBIT B-6: "THEY LIED FROM THE JUMP"**




[0:00] And another thing, I was just sitting here going through the interview that Nolan's mother had did last night. I think it was last night on CNN and the host had asked her, can you share with us why in the initial missing report was the items that Nolan had on different from what

[0:22] obviously had been shared on social media and she said that she was told by the thugs that he had on black trunks. Now make that make sense. Why would y'all lie from the jump? Anyways so some young lady had found it

[0:38] had seen what she was saying on social media and she had message his mother and said that's not what he had on let me show you what he had on because she had taken a picture of Nolan and those thugs and in the picture obviously was the blue trunks that you guys have been seeing circulating this young lady took a picture and sent that to his mother to tell him that this is what he was wearing

**EXHIBIT B-7: "AND DID YALL CATCH THE SIGNAL ON THE CAP FROM THE ATTY"**




[0:00] So what I do believe when Jackson is telling us in the interview do you? Don't you like what you think that you would have seen no one on the bottom of the on the floor or something? Really believe that we would call Sito because they would be able to see the body that's laying there. So again, I believe to sub-magitude that Jackson is telling the truth about what really happened to Nolan. However, that video that was made, the alleged sinking, uh,

[0:24] reenactment was literally just that and that's why we were able to see a hand coming up how. Now they actually helped us in the reenactment because now we know that an actual body can be hidden there because we did not see it until someone's hand came up and went back down. I know y'all y'all are wanting to believe that that is no only no but follow me I believe that I believe that

[0:47] There is that a body can fit there because they showed us in the reenactment and I'm going to post another little clip where Jack tells us that that man was rolling. Just listen. As you posted that clip of all of us on the boat, you know, as it's rolling, not rolling but.

[1:06] So while we're mad that they're doing these interviews is actually helping us putting all the pieces together. That's all I got to say.

**EXHIBIT B-8: Reply to viewer comment, captioned "JUSTICE FOR NOLAN WELLS"**




[0:00] That's what's your thing got y'all on third on like nah on clap y'all swan y'all we win it because they're gonna come after everybody who's been saying stuff about them dugs tugs tugs tugs tugs tugs tugs tugs tugs tugs tugs tugs tugs tugs that they change my mind man i don't fear nobody but god i do not fear no man man what is y' is y'all talking about

[0:18] Y'T'E's really hyping y'all all the way up like, we're gonna go get these people for saying these bad things about our mam bye. Y'all y'all got me so twisted I could care less about any of that because if they mean what everything that we've been saying is what's been out there from the news outlet to all of the high-powered because I think this is what I think is funny

[0:41] So you're not going to go get Tated because he was the main one lying you're not going to go after the non-let me you're not going to go at the T. M. T. T. T. T. M. T. T. T. T. M. Not going to go after all of them people who was literally. But you're willing to go over there and def, and a matter of fact it wasn't a lawsuit. It's a deceased and a desist.

[0:59] Just basically want her to shut her mouth and stop talking about fart. That's all it is. So they're gonna send all of us that? I mean, listen, he's not that important to me and he's irrelevant in this circle. But anyways, I digress, I could care less about what y'all talk about. That crap don't scare me and I'm gonna keep talking about them thugs. Period.

**EXHIBIT B-9: "BREAKING NEWS!!!"**




[0:00] Breaking news for certain, the Jackson County grand jury has unanimous as returned a no true bill in the death investigation of Nolan Xavier Wells, meaning that no one will be indicted based on the evidence presented. We already know who presented the evidence. Y'all, listen, this does not mean that it's the end. However, it did shake me back a little bit. They even had a witness in the essence of...

[0:20] The grand jury reviewed evidence of bruising. We knew he had bruising, however, it said that the evidence of bruising on Wells' body and reported far from a boat. A witness told investigators that Wells had slipped awkwardly from the side of a boat around 3.30 p.m. on July the 4th, but could not say whether he struck his head in doing some.

[0:37] The witness also said that Wells continued socializing and did not appear injured. The another thing that the report the report also says that toxicology results found no no rugs in his system or any evidence that he ever used that he never used a so tatum you owe his family an apology however listen

[0:54] We already knew that this was going to come. Y'all this is another part that took me back is that the grand jury report acknowledges that Mississippi has no statute of limitations for homicide Okay, it says that if credible evidence later suggests Wells death was not accidental that the matter should be presented to Jackson County grand jury for further consideration I told y'all to be prepared because we were already aware

[1:16] Tyler mentioned it on many of occasions that what we were already going to be hearing. I'm just is not the end okay don't lose hope and don't go out there doing nothing crazy just justice will prevail just be patient.

**EXHIBIT B-10: "Nolan Wells Grand Jury — Questions That Need Answers!"**




[0:00] All right, y'all. We have more questions, more questions because we're going to read. We're going to talk about the grand jury report regarding the Nolan Wells case because there are a lot of questions and no answers. Okay, first, the first 25 jurors were selected, but two requested to be excused for urgent and avoidable reasons per se. Now I'm wondering, did they simply have personal emergencies or did they want to be, did they even want to be involved?

[0:20] right because this is a highly public sized case. Here's where it gets interesting. The grand jury issued 132 subpoenas and heard from 43 witnesses. But seven individuals were invited to testify y'all. And one report it couldn't attend and another decline. This is my thing. Now, could the person who could not attend?

[0:40] Ben Eric, I'm just saying who was allegedly out of the country. That's my theory, not facts. I'm just wondering, was he the one who said no, I don't even want to come in there, but anyways, okay, let's move on. But the biggest question here is why does this report spend so much time on addressing the public opinion social media allegations and against the boat occupants?

[0:59] Now this is my thing the grand jury's responsibility was to examine the evidence. They examine the evidence in regards to no longer well's death and determine whether criminal charges were supposed to warrant it not focusing on all of that schematics when it comes to social media da da da da da da da da. That held no relevancy so I'm confused but anyway so how much attention was actually given

[1:21] to these circumstances surrounding Nolan Wells death or was it more focused on the controversy about what the public was saying in regards to them over there. And with two invited witnesses not appearing in person, what additional questions might their testimony have answered? Because one thing I do know is that the two witnesses out of the seven that did not show up and did not want to come, they used their original.

[1:41] police report that was given from the beginning, which is crazy to me, but I would their testimony have even helped additionally to answer the questions at this point. I don't believe so. But anyways, no true bill does not mean that we are going to stop.

## EXHIBIT B-11: "THE STREETS WILL TALK 'WITNESSES'"




[0:00] We always end up talking and anything that you do you just can't keep it from anyone because how about these two ladies we're talking about a fight that they witnessed and could it be these ladies that had text this message to Eric? Listen to what this brother has to say because he said that he was at a hosp or outpatient

[0:18] somewhere and he was listening to a conversation by these two women who were there at the Horns Island and was literally not that far off from the distance of where these boats were and what she witnessed. Just listen. Well, on the boat, whenever these white kids boat was at 2530 yards they were on another boat tied to and saw this in time saw.

[0:37] She's saying Nolan and the white boy squared up. They were on the boat, okay? But she said when Nolan, they must have had a verbal altercation or something. All right, whatever. So Eric, was it you? Because why would she message you on Instagram and then you block her three days later after she told you that she saw. That was about, she didn't know. They was in the book.

[0:57] She actually said, she was white boy snuck Nolan and hip tossed him and when Nolan went down on the boat he never got back up. So now that makes sense about this awkward fall, right? Was it one of them, one of those boys, because when this man is describing this fall and how Nolan fell and that he never got back up, I could see, I could see that. I can visualize that that is exactly what happened to him.

[1:21] And you guys hurried off. So now it's all coming together via the text messages that are confirming about what's going on, what happened, what's the next game plan, what are we gonna do next ring? Is that why Eric didn't want to get back on? Because one of you guys stuck Nolan, right? And picked him up and slammed him on the boat, which is the awkward slip that you guys claim it was, and now he is dead. He is gone.

[1:47] You're here.

## EXHIBIT B-12: "NOLAN WELLS — THE FIGHT, THE FALL & THE SEA TOW CALL!"




[0:00] Oh, but it ain't, but let's talk about it. So now, Warren said that the Palm Beach left around 3 p.m. correct? Okay, Lucas said that he saw Nolan get on a white bulb with the center console around that same time. Okay. Last time I saw Nolan was three o'clock. And no one

[0:19] was cradling. All of me. Now Katie reportedly stated that no one told her that he was leaving at the same time. Three o'clock I find it amazing how everyone is on this three o'clock. Now let's fast forward to approximately 4.30. 430. Some more stuff happens at 4.30 Warren tells us that why it was yelling to Warren to get on the effing boat right at the

[0:38] My buddy yelled at, you know, Yellin, Nolan, get on the boat. We're leaving. The boat's about, the boats having issues and like, no, he didn't say that, but he was panicking, Nolan, get the F on the boat, get on the boat. The same time, Warren says.

[0:55] that he laid eyes on Nolan and Katie in the water, right? Then he said that someone came and told him, all of this is happening at 430, someone came and told him that his brother was in a fight and he runs over there to help his brother with this fight and then he also brings his brother back over there to the... I had a girl come up to me and say, hey.

[1:12] your brother just got in a fight and obviously I have a younger brother. Now according to witnesses after this alleged MMA fight and again when Warren said he went and got his brother the witness said that they actually seen them everyone hurried hurried out hurried out on the they all sped off right what if no one was on that button we're gonna call he was on that book now what if this awkward fall that the DA said because the DA said that a witness

[1:38] discussed that no one experienced an awkward fall. How could no one else on the island see this awkward fall only but this one alleged witness follow me now so he's on this boat they're speeding off that awkward fall surely had had to happen on the book could that be where the back where he lost his balance struck his head and that's what or it all happened that is just a question of seetow call with it because what if

[2:02] if the reported fall happened shortly before the call because remember the Emmy said that Nolan's the no white cells right no white cells are being established and that whatever happens to Nolan happened within that four hour window frame

[2:21] Now you got to think about the map. When they left the island, where they went to, all that, this and this and this and third or another, remember all of that. Right? Because if you're looking at that, you're looking at three, four, five, six, seven.

[2:41] Is that why they're trying to say that Nolan was never on the boat? Because you have to think about it, somebody is going to be responsible for his death. I've been saying this from day one. Y'all know that it would make you guys responsible for what happened to Nolan and y'all didn't render aid. But the fight, the boat, leaving the reported fall, the seat, the seat-to-call.

[3:04] I'm asking questions whether the available evidence establish exactly what happened during those critical hours. And remember, no true bill doesn't mean that every question was answered. Actually, it leads us more questions than it did answers. Also, remember, justice for Nolan Wells, we're going to continue to fight. This is not the end. This is not the end. Justice for Nolan Wells.

**EXHIBIT B-13: "THE 2 CIRCLE BRUISES"**




[0:00] I was sitting here thinking, well, I was thinking last night, about the image that a crump had shared with us on the news conference regarding when they were doing the phone dumping. And I was thinking to myself, the image that he held of Nolan's contusions and bruising in the back of his head, I was just thinking that what could have caused those circling?

[0:20] if you will, on the back of Nolan's head. Right? Let me just remind you of what he showed us yesterday. Hold on. Now if you take that with this picture, I'm just saying, let's look at the picture.

[0:38] Now remember they said that they love fishing and and and you could put what what did the man say two plus two equals be come on we do know for certain without a shadow of a doubt that Nolan was on the boat we know that he was on the boat because his phone places him on the boat and his the last time that Nolan was actively using his phone at two 17 to 18

[1:03] was on the boat and Morgan sent him a text message and was saying, it's yikes, right?

**EXHIBIT B-14: "Yall gotta let the 3rd go.."**




[0:00] I see that everybody seems to want to hold on to the third and I am not sure why you guys want to hold on to it because Garrett confirmed that nothing happened on the third the third was fine like everything was smooth sailing there was no nothing that warned him to feel like

[0:17] he needed to pay attention to that day. Now he extracted everything out of Nolan's phone, like every day of whatever was still in Nolan's phone. There was nothing like he didn't pick a specific day and say, hey, let me just focus on the fourth. No, he extracted everything. Y'all have to let the third go. Nothing happened to Nolan on the third. Everything that could have and did happen to him was from the fourth into the early morning hours. So.

[0:42] literally his passing happened during the time he got onto that boat and whatever in that time. Per Gary, because Nolan made it on that boat. At 218, it was his last interaction with his phone at 218 and that it was on the boat.

## EXHIBIT B-15: "SO THERE WAS A FIGHT ON THE BOAT"




[0:00] I do not like using those green screens so we just going to do it this way now I have another clip or text group that I want to show you and I'm just wondering well I'm not even surprised that I actually that we found this that there was actually a fight there is a video in this Snapchat where they are showing that Nolan was in a fight

[0:22] And he was, somebody was screaming at him and etc. for the ends to get off the boat. Now I wonder who that was. Whose boat was that? And I'm not surprised that there was a fight on the boat because now that makes sense to the contusions in the back of the head.

[0:44] bruising in the back. It's coming together. Just keep reading the text messages or text Snapchat messages in that one group because there was two different groups. Two different groups and in the main group. Yeah, but let me show you.

## EXHIBIT B-16: "THE KATIE STORY WAS FAKE"




[0:00] Let's think about the Katie's story because we know by now that that story was not true. We know and I believe that for a long time because I've been saying it for a long time that Katie was just a pawn that whole Katie theory about Katie last on Nolan at 3 o'clock.

[0:18] Katie can verify that Nolan didn't get on our boat and that they have a text message. Where is that text message? Because we never seen it. Also, how could Katie and Nolan be in the water cuddling in this water per that story? When there is video showing Katie being on a different boat passed out, drunk passed out.

[0:41] Not only that, but her sister Gracie said that Katie made it home safely because she called a ride or like I think her uncle or somebody came and got her or someone of the family came and got her. So how could that story be true? Those things can't be true at the same time. Katie, Katie wasn't on the boat. It was just a pond. It was a story to cover their tracks.

## EXHIBIT B-17: "ALWAYS A STORY FILLED W/ LIES AND TRUTH"




[0:00] Now that's a girl is just shot because she just shared a video in regards to what Jack said could have potentially happened to Nolan The irony in what he is saying is exactly what I just said in a video that I posted a couple of days ago But let's let's listen to what I said and then we're gonna listen to what Jack said hold on speeding off that awkward fall surely had to happen on the book

[0:21] And I believe he was really messed up and I think that the person driving could have probably floored it on the way back in, like they idled out of something, they could have poured it. And he could have been sitting on the back of the boat. And whenever they flored it, I feel like it could have rolled off into the water and not.

[0:41] I have to agree with my girl because first of y'all you're saying that he stayed behind that he chose to stay behind and then y'all were very adamant about that he drowned remember the washer machine area remember now all of a sudden now you're really you're actually really telling us what you know happened but you're trying to display it as well I think happened

[0:58] because the snapchat conversations that y'all were having because the snapchat's conversation was actually telling us that why it and Nolan had got into a fight but then y'all trying to chop it up as it was he maybe this because anyways y'all always seem to tell the truth in the lies that y'all give but anyhow that's whack and you're crazy and so are they

**EXHIBIT B-18: "WHEN EXACTLY DID YOU HAVE TIME TO CONFIRM AND ASSURE EVERYONE THAT NOLAN HAD A RIDE HOME?"**




[0:00] I was thinking about the interviews as these freaking idiots did on Fox, whatever crap it is. The fact that Jacks, their stories continue to change. At Nolan, and Wyatt looks at Nolan, he's like, hey, like we got to get on the boat right now, like whether he's riding back with her, so we said, okay, as long as you have a ride back, you're good, we're good.

[0:23] like the narcissistic in them, the manipulation in them, the little innocent, oh my God, where it's so disgusting and sickening because Jack, what are you talking about? Whenever in the text messages, Snapchat groups, did you guys ever say or even on your other interviews? Did y'all ever mention that...

[0:43] you guys actually confirmed with like you guys yeah you know he told us he wanted to say and so we said okay as long as you're good then we're good when when did you have time for that because the last time that why you all no one was when my buddy was yelling at him to get on the boat said anything to no one no one no and per warin

[1:05] Why it said get the f on the boat get the f on the boat no lane no lane it's time to go get the f on the boat what are you talking about

**EXHIBIT B-19: Reply to viewer comment regarding Nolan's phone**




[0:00] It's like the last time that there was activity from Nolan on his phone was 2-18, okay? Then there was someone else after his death shows that they got into Nolan's phone, either by entering his password or putting his phone in his face for face recognition.

[0:20] What part of those messages that Garrett said that y'all refusing to believe or understand that there is truth to that? Stuff was deleted from his phone. Everything that Nolan did on the 4th of July to include his napped and videos and pictures that he took were deleted from his phone. Nolan couldn't have deleted them himself.

[0:39] because by this point he was unalive what are you talking about? I'm so confused why you guys just find that so hard to believe now there was a point where you guys can you know come on with this shim shams and make all kind of excuses but there's no excuses right now I'm sorry sir man whatever you are y'all got to cut that foolery out when why when will y'all accept that part how about that when will you accept

**EXHIBIT B-20: "LETS HEAR FROM GARRET"**




[0:00] I mean there's not really a whole lot of talking that I need to do because I think Gary can do a whole lot of talking for me so let's listen to Gary. Did you delete anything out of Nolan's phone? No, of course nothing. There were things that were deleted from the phone. I can't talk to intent. Yeah no one's not to delete anything but at the first place.

[0:17] We have nothing to delete on no one's phone like I don't know what this because no one didn't take snapchats that day that means things were deleted. There's just no living in the moment we were just living in the moment. Y'all were just living in the moment, huh? There was no reason to take anything that day

[0:34] Nothing at all. But let's listen to what Garrett has to say. Hold on. There's photos from that day that we were able to recover that lets us know he was on the boat. So there was no reason to delete anything. Garrett says there was solutions to Snapchat. You guys say you was living in the moment.

[0:52] There was no pictures. There was no reason why Nolan didn't take anything on the 4th of July. Actually you said the 3rd or the 4th of July, but Garrett said there actually were pictures and things of that nature that Nolan actually did take that were deleted. Huh. And he did say that Nolan was on the boat. That there was videos that they took and were deleted that shows that Nolan was on the...